1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

RIGOBERTO GOMEZ SANCHEZ,

Case No.   1:23-cv-00209-KES-HBK (HC)

12

Petitioner,

FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY [1]

13

v.

14

McVAY, Acting Warden,

15

Respondent.

FOURTEEN-DAY OBJECTION PERIOD

16

17

18

## I.   STATUS

19

Petitioner Rigoberto Gomez Sanchez ("Petitioner" or "Sanchez"), a state prisoner, is

20

proceeding pro se on his Amended Petition for Writ of Habeas Corpus filed under 28 U. S.C.

21

§ 2254 on February 10, 2023.  (Doc. No. 4, "Petition").  Petitioner challenges his convictions

22

after a jury trial for premeditated murder, attempted murder, shooting at an inhabited dwelling,

23

assault with a firearm, and residential burglary, as well as sentencing enhancements for the use of

24

a firearm.  (Case No. BF168876A).  (Doc. 15-2 at 1232; *see id.* at 978-96).[2]  The Kern County

25

26

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2025).

27

[2] All citations to the pleadings and record are to the page number as it appears on the Case Management and Electronic Case Filing ("CM/ECF") system.

28

1

Superior Court sentenced Petitioner to an indeterminate term of 50 years to life in prison, plus a determinate term of 30 years plus four months.  (*Id.* at 1232; *see id.* at 1028-31).

The Fifth Appellate District Court affirmed Petitioner's convictions on direct appeal. (Case No. F078259).  (Doc. No. 15-2 at 1231-64).  On February 9, 2022, the California Supreme Court summarily denied Sanchez's state petition for review.  (Case No. S272319).  (*Id.* at 1266).

The instant federal Petition presents the following (restated) grounds for relief:

> (1) The prosecutor engaged in prosecutorial misconduct during rebuttal closing arguments when she accused defense counsel of repeatedly lying to the jury and intimidated minority jurors.

> (2) The trial court erred when it took judicial notice of specific times in a printout from California Justice Information Services ("CJIS").

> (3) Petitioner was denied his right to be present at trial when he was not permitted to be present for a readback of his testimony to the jury during deliberations.

> (4) The cumulative errors amounted to a denial of due process.

(*See* Doc. No. 4 at 5-10, 37-38).  Respondent filed an Answer (Doc. No. 16), arguing Petitioner was not entitled to relief on any of his grounds, and lodged the state court record in support (Doc. Nos. 15, 15-1, 15-2).  Petitioner filed a traverse.  (Doc. No. 17).  This matter is deemed submitted on the record before the Court.  After careful review of the record and applicable law, the undersigned recommends the district court deny Petitioner relief on his Petition and decline to issue a certificate of appealability.

## II.    GOVERNING LEGAL PRINCIPLES

### A.    Evidentiary Hearing

In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id*.  Here, the state courts adjudicated Petitioner's claims for relief on the merits.  This Court finds that the pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary

1    hearing is required. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

2         **B.     ADEPA General Principles**

3         A federal court's statutory authority to issue habeas corpus relief for persons in state

4    custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

5    Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

6    first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

7    the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

8    of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

9    the merits, then AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*,

10   136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a

11   claim adjudicated on the merits, but only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

16   28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

17   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

18        "Clearly established federal law" consists of the governing legal principles in the

19   decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

20   U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

21   unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

22   to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

23   governing law set forth by Supreme Court case law; or (2) reached a different result from the

24   Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

25   12, 16 (2003).

26        A state court decision involves an "unreasonable application" of the Supreme Court's

27   precedents if the state court correctly identifies the governing legal principle, but applies it to the

28   facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

3

1  133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

2  [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

3  extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,

4  407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas

5  relief so long as fair-minded jurists could disagree on the correctness of the state court's

6  decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the

7  state court decision "was so lacking in justification that there was an error well understood and

8  comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

9        When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

10  State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

11  the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt*

12  *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

13  merely because the federal habeas court would have reached a different conclusion in the first

14  instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

15        Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

16  constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

17  *Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of

18  AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-

19  prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas

20  petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable

21  precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

22  112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails

23  to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has

24  cleared both tests." *Id*. at 134.

25        As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

26  an "adjudication on the merits" in state court. An adjudication on the merits does not require that

27  there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

28  at 98. "When a federal claim has been presented to a state court and the state court has denied

relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

## III.    RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

**STATEMENT OF FACTS**

***Prosecution's Case***

Rigoberto Sanchez and Sandra Sanchez were married in 2003. Sandra had two children from previous relationships, Johnny and Marissa. Rigoberto raised Johnny and Marissa as if they were his own children. Rigoberto and Sandra also had one child together, a daughter, who died from a birth defect. After their child died, the marriage became strained.

Rigoberto blamed Sandra for their daughter's death. Sandra was upset by Rigoberto's gratuitous dishonesty. The couple separated

5

briefly in 2012 but later reconciled. In October 2016, Rigoberto moved out of the couple's home at Sandra's request. Sandra moved into an apartment with her son Johnny, while Marissa and Rigoberto moved back into the family home.

Rigoberto was having difficulty coping with the end of the marriage. In December of 2016, he called Sandra hoping to reconcile. Around this time, Sandra began dating Edwin Lima, a married correctional officer who worked at Tehachapi State Prison. Rigoberto and Sandra were also both employed as correctional officers at Tehachapi State Prison. Rigoberto told Sandra, " '[she] better not be dating anybody from work and make [him] look bad,' " and he was " 'not going to see [her] happy with any other [man], especially someone from work.' "

On March 9, 2017, Sandra was at work when she received a notification on her phone that someone was near her front door. She had installed a Ring doorbell camera a few days prior because she suspected Rigoberto had entered her apartment while she was not home. When Sandra checked her phone, she saw video of Rigoberto approaching her apartment.

Rigoberto used a key to access the apartment. Using the Ring application, Sandra asked Rigoberto, " 'What are you doing? You're breaking into my apartment. I'm going to call the cops.' " Rigoberto replied, " 'I'm looking for proof.' " He did not elaborate.

Sandra reported the incident to Rigoberto's immediate supervisor at the prison, Lieutenant Madden. She wanted the incident handled informally so that Rigoberto's job would not be jeopardized. Upon her request, Rigoberto filed a petition for separation. Sandra changed the locks on her door and ceased all communication with Rigoberto.

On May 25, 2017, Sandra and Lima left for a four-day cruise. During the trip, Sandra checked her Ring doorbell video application and saw a man walking toward her doorbell with a hammer. The man, later identified as Ross Stovall, appeared to be a transient. Stovall removed the Ring doorbell with the hammer, but the doorbell kept recording. Rigoberto was also depicted in the recording. When Johnny returned home, he called Sandra to tell her that someone had broken into their apartment.

On May 28, 2017, when Sandra returned from her cruise, she noticed items missing from her apartment, including her gun. She called the police to report the burglary.

A police officer with the Bakersfield Police Department called Rigoberto's home phone and cell phone over a dozen times and surveilled Rigoberto's pickup truck, which remained parked outside of Rigoberto's home. Johnny told Rigoberto that " 'They had [him] on camera breaking into the apartment.' "

Sometime after the police left her apartment, Rigoberto called Sandra from an unknown telephone number. He began yelling at

Sandra and questioned her about the cruise that she had taken with Lima. Sandra hung up the phone.

At approximately 7:00 p.m., Rigoberto called again. This time, Lima took the phone from Sandra and a 40-minute argument ensued between Lima and Rigoberto. Sandra and Johnny both heard Rigoberto yelling at Lima over the phone. Lima responded calmly.

At approximately 8:00 p.m. that evening, Rigoberto told his son Johnny that he was leaving town. Rigoberto was crying. He told Johnny the police were looking for him, he was afraid of losing his job, and that he had to flee. Rigoberto was driving Marissa's car, which was uncharacteristic for him to do. He gave Johnny money and his ATM card and personal identification number.

Between 9:00 and 9:30 p.m., Marissa called Rigoberto and told him she had seen Lima at Sandra's apartment. Around this same time, Rigoberto called Johnny and told him to spend the night at Marissa's house.

At 10:00 p.m., Rigoberto visited his sister and gave her a framed photograph of his dog. Rigoberto was acting strange and his sister thought he was going to commit suicide. A handwritten will was inscribed on the back of the photograph.

At 10:13 p.m., Rigoberto called Sandra a third time. After a brief conversation, Sandra hung up the phone.

At approximately 10:15 p.m., Rigoberto called Johnny and asked him if Sandra and Lima were home. He told Johnny he recognized Lima's vehicle in the parking lot of Sandra's apartment complex. Johnny lied and told Rigoberto that Lima and Sandra were not home.

At approximately 10:40 p.m. that evening, Lima sat on Sandra's bed attempting to setup a second Ring doorbell camera that he had purchased. Suddenly, gunshots erupted.

Sandra rolled off the bed and began crawling toward her son's room, telling him to " 'Get down, get down.' " Sandra yelled, " 'Get the gun.' " A second volley of shots erupted. Sandra managed to call 911. Immediately after the shooting stopped, she heard knocking at her front door. Believing that the shooter was at her front door, Sandra crawled back into her bedroom to retrieve Lima's gun from his holster. She found Lima unresponsive.

Lima had been shot more than 20 times, including in the head and in the back. A pathologist subsequently determined that at least 15 to 20 shots occurred while Lima was laying on the ground. According to Sandra, Lima did not pull out his gun prior to the shooting.

Sandra racked a round from the gun, ejecting the bullet from the chamber so that it could not be fired. Neighbors standing outside her window assured her that the shooter had fled and that help was

at the front door. Sandra put Lima's gun down.

None of Sandra's neighbors reported hearing arguing or yelling prior to the shooting.

### The Arrest

Detective Littlefield from the Bakersfield Police Department used a license plate reader system to locate Marissa's car. He determined that on May 28, 2017, the vehicle was observed on the freeway headed towards Mexico.

Several weeks after the shooting, Mexican authorities located Rigoberto in Mexico and deported him to Arizona. Rigoberto had grown out his facial hair and wore "tattoo sleeves" to disguise himself.

### Police Interrogation

Detective Littlefield and his partner, Detective Davis, interrogated Rigoberto in Arizona. During the interrogation, Rigoberto admitted that he had made a copy of Johnny's key to Sandra's apartment and that he had previously used the key to access Sandra's apartment.

Rigoberto told detectives that he believed Sanchez was cheating on him with Lima, whom he described as a "dirty cop." On the night of the shooting, Rigoberto challenged Lima to a fight while they were arguing on the phone. According to Rigoberto, Lima never threatened him during the conversation. Rigoberto stated that he walked up to Sanchez's bedroom window with a gun in his hand, but he did not remember how many shots he fired into Sandra's bedroom, where he was aiming, or whether anyone had fired back at him.

On June 29, 2017, Rigoberto was interrogated at the Bakersfield Police Department by Detective Littlefield and Detective Davis. Rigoberto claimed he snapped after Lima told him, "I'm [sleeping with] your wife." He decided he was not going to put up with the situation any longer.

Rigoberto acknowledged he had an anger problem and stated he would often get tunnel vision. On the night of the shooting, he gripped his gun so hard it left marks that had not healed 30 days later. Rigoberto did not remember walking up to Sandra's window or throwing something through the window. He claimed he did not remember seeing anyone in the apartment.

### Defense's Case

Rigoberto waived his Fifth Amendment right and testified at trial. He knew Sandra was dating someone as early as October 2016 because he began searching her cell phone records. Rigoberto claimed he decided not to reconcile with Sandra when he discovered she went away with Lima for New Year's Eve.

Rigoberto stated Lima had called him three days prior to the shooting and had thanked him for paying for the cruise Lima and Sandra were about to take. Rigoberto also claimed Lima threatened to assault Rigoberto's younger brother, Gerardo, who is also a correctional officer at Tehachapi State Prison. Rigoberto stated he reported the threat to his supervisors. They told Rigoberto that there was "no proof" to support his claim, and they alleged he had fabricated the threat. On cross-examination, he specified he had reported the threat to Sergeant Clayton.

Rigoberto claimed Lima was a "dirty cop," but he did not have any evidence to support his opinion. He never liked Lima. In February 2017, Rigoberto admitted to sending his son into Sandra's room to look for photographs of Lima and Sandra together. He wanted to send the photographs to Lima's wife.

Rigoberto admitted to breaking into Sandra's apartment on two prior occasions. He paid Stovall $80 and two cheeseburgers to remove the Ring doorbell on Sandra's apartment door for him. Rigoberto denied Stovall's claim that Rigoberto had offered him $5,000 to burn down Sandra's apartment.

On the day of the shooting, Lima called Rigoberto on Sandra's phone and an argument ensued. Lima continued to taunt Rigoberto. He challenged Rigoberto to a physical fight, prompting Rigoberto to go over to Sandra's apartment. Rigoberto borrowed his daughter's Corolla and drove over to Sandra's apartment. He had a loaded Glock .22-millimeter firearm with a 15-round magazine, and a spare 15-round magazine.

That evening, Rigoberto had already decided to leave town and he had his bags packed. He was told there was a warrant out for his arrest for breaking into Sandra's apartment.

Rigoberto claimed that when he arrived at Sandra's apartment, he confronted Lima when he saw Lima standing outside. In response, Lima ran back inside Sandra's apartment. As Rigoberto walked back towards his car, he saw Lima looking out of Sandra's bedroom window. Lima yelled a disparaging remark about Rigoberto's daughter.

Angry, Rigoberto picked up a cinderblock and threw it through Sandra's window. When he saw Lima reaching for his gun, Rigoberto pulled his own gun and began firing in Lima's direction.

When the gun slide locked up, Rigoberto dropped the magazine and reloaded. Suddenly, Sandra came running out of the room, swung the door open, and pointed a gun at Rigoberto. He fired the gun at Sandra in self-defense. Rigoberto claimed that every shot he fired was in self-defense.

After the shooting, Rigoberto panicked, got into his car, and drove with no destination in mind. He tossed his cell phone out the window and his gun down a storm drain. Using his uncle's truck, he crossed the border into Mexico. He was subsequently arrested by

Mexican authorities and was deported back to the United States.

When he was taken into custody, he had two interviews with police, one in Arizona and one in Bakersfield. During the first and second interviews, Rigoberto withheld information from the police. Rigoberto claimed he was interrogated a third time by Detective Littlefield and Detective Davis at the Bakersfield Police Department. During this interview, he claimed he told the detectives that he had acted in fear for his life.

***The Prosecution's Rebuttal Witnesses***

**Sergeant Clayton**

Sergeant Clayton, a correctional sergeant at Tehachapi State Prison, testified that Rigoberto never reported any threats to him concerning Rigoberto's brother. Sergeant Clayton was transferred from the Investigative Services Unit during the first week of May 2017, before Rigoberto claimed he reported Lima's threat.

**Detective Littlefield & Detective Davis**

According to Detective Littlefield, after Rigoberto was interrogated in Bakersfield, he was moved into a holding cell to eat and to await transport to the county jail. Both Detective Littlefield and Detective Davis testified that Rigoberto was not interrogated a third time while in the holding cell. Detective Littlefield submitted an electronic arrest card for Rigoberto at 10:28 p.m. The detectives then transported Rigoberto to the central receiving facility at the county jail where he was booked at 11:07 p.m.

***The Defense's Surrebuttal***

Rigoberto maintained that Sergeant Clayton was not telling the truth, and that he had reported Lima's threat to Sergeant Clayton. Rigoberto further claimed, contrary to the testimony of Detective Davis and Detective Littlefield, that a third unrecorded interrogation occurred at the Bakersfield Police Department.

(Doc. No. 15-2 at 1233-40 (footnote omitted)).

## IV.    ANALYSIS

Each of Petitioner's grounds were raised on direct appeal to the Fifth Appellate District Court and denied, then subsequently raised and summarily denied by the California Supreme Court. Thus, each ground is exhausted, and the Court looks through to the Fifth Appellate District's reasoned decision in evaluating the claims under the deferential standard of review. *Wilson*, 138 S. Ct. at 1192.

10

1    **A.    Ground One-Prosecutorial Misconduct**

2         In his first ground, Petitioner argues the prosecution engaged in prosecutorial misconduct

3    when she accused defense counsel of repeatedly lying to the jury and when she intimidated

4    minority jurors.  (Doc. No. 4 at 6, 37).

5              **1.  State Court Decision**

6    The Fifth Appellate District denied Plaintiff's prosecutorial misconduct claim as follows:

7         Sanchez contends the prosecutor committed prejudicial error during
     her closing argument by accusing defense counsel of repeatedly
8         lying to the jury, and by subtly but forcefully intimidating any
     potential holdout jurors. We find no evidence of prosecutorial error
9         upon this record.

10        **A.  Background**

11        During her argument in rebuttal, the prosecutor made the following
     statements:

12

13        "[PROSECUTOR]:   I'll agree with one thing that counsel said,
     and that's that Mr. Sanchez is stupid. What he did that night was
     stupid. And it was a series of stupid mistakes and stupid decisions.
14        He did put himself in this situation. No one else did. Not Detective
     Littlefield. Not me. Not Ross Stovall. Not Sandra Sanchez. He is
15        the one who started this entire chain of events that happened over
     months, and months, and months, and culminated in the murder of
16        Edwin Lima. There's some studies that show that the more you
     repeat something, the louder you say it, some people may start to
17        believe it. And that's why [defense counsel] talked for three hours
     at a very high volume and repeated the same lies over, and over,
18        and over, hoping one or two –

19        "[DEFENSE COUNSEL]: Objection, your Honor. Objection. That
     would be improper. Defense would have a motion.
20

21        "[PROSECUTOR]:   I'm sorry, Judge, for – after the things he
     called me?

22        "THE COURT:      Counsel, look, both of you. Civility governs.
     This is a search for the truth. No personal defaming comments. [¶ ]
23        Disregard any of those comments, ladies and gentlemen. You're
     respectful job is to decide the case solely and only on the evidence
24        and the law."

25        After further discussion, the prosecutor continued:

26        "[PROSECUTOR]:     You repeat the same lie over, and over, and
     you hope –
27

28        "[DEFENSE COUNSEL]: I'll object again, your Honor."

11

The trial court asked the prosecutor to restate her argument. The prosecutor made the following comments, in relevant part:

"[PROSECUTOR]:    And you all were chosen for a reason. You all have common sense and life experience and the ability to decide who's telling the truth and who's not. Who has an interest in the outcome of this case? Who is willing to get up there and lie to you yet again? It's [Sanchez].

If I had met with Dr. Carpenter and showed him the photo, or met with Detective Pair and showed him or spoke to him about something, then counsel's going to be up here saying, '[the prosecutor] rehearsed the whole trial.'

"[DEFENSE COUNSEL]: Objection. That's improper. Defense has another motion.

"THE COURT:      Ladies and gentlemen, you're to judge the case solely on the evidence and the law, and any dispersions that counsel may cast towards either side, disregard that. What the attorneys say is not evidence. You are the sole judges of the evidence and the law."

Following the parties' closing arguments and outside the presence of the jury, the trial court returned to defense counsel's objections. Defense counsel moved for a mistrial, insisting the prosecutor had called him a liar and that he had interrupted her to prevent her from "doing more damage when she said she hopes one or two of you will bite." According to defense counsel, the prosecutor's second statement was analogous to comments made by the prosecutor in [*People v. Sanchez*, 228 Cal. App. 4th 1517 (2014)]. The trial court observed that in *Sanchez*, the appellate court found prosecutorial error where the prosecutor had stated, "the jury would need to be gullible, naïve, and hoodwinked to believe defendant, who would then go home and laugh at their expense." (*Sanchez*, *supra*, 228 Cal.App.4th at p. 1534.)

Defense counsel acknowledged the trial court had instructed the jury to disregard the prosecutor's statements concerning "telling lies," but he insisted the statement amounted to prosecutorial misconduct. The prosecutor replied that she was "allowed to comment on Mr. Sanchez's repeated lies to this jury." The trial court stated that it had not interpreted the prosecutor's statement as a suggestion that defense counsel was repeatedly lying.

Following a readback of the prosecutor's statements, the trial court found no error. The trial court concluded the prosecutor's statements were a fair comment on the evidence.

Defense counsel declined to have the trial court provide an additional curative instruction to address either asserted error because he did not want to call attention to the errors. Defense counsel acknowledged that the trial court had twice admonished the jury.

**B.  Relevant Legal Principles**

"It is misconduct for the prosecutor in argument to impugn the integrity of defense counsel or to suggest defense counsel has fabricated a defense." (*People v. Cash* (2002) 28 Cal.4th 703, 732; *People v. Bemore* (2000) 22 Cal.4th 809, 846; *People v. Bain* (1971) 5 Cal.3d 839, 847.) To that end, it is improper for the prosecutor to characterize defense counsel as a liar or to accuse defense counsel as lying to the jury. (*People v. Young* (2005) 34 Cal.4th 1149, 1193.)

Although a prosecutor is not permitted to make denigrating remarks about defense counsel, " 'harsh and colorful attacks on the credibility of opposing witnesses … are permissible.' " (*People v. Pearson* (2013) 56 Cal.4th 393.) " 'The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence … [and] to argue on the basis of inference from the evidence that a defense is fabricated.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 433.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

"In evaluating whether prosecutorial error is prejudicial, the standard for prejudice depends on whether the error violates the federal Constitution or the California Constitution; if it is the former, the error mandates reversal unless it is ' " 'harmless beyond a reasonable doubt' " '; if it is the latter, the error mandates reversal 'if there [is] a "reasonable likelihood of a more favorable verdict in the absence of the challenged conduct." ' " (*People v. Collins* (2021) 65 Cal.App.5th 333, 342.)

**C.  Waiver**

The parties do not address the issue of waiver. Defense counsel declined a curative admonition by the trial court claiming he did not want to highlight the prosecutor's challenged statements to the jury. The failure to request a curative admonition may result in waiver of prosecutorial error on appeal. (*People v. Prieto* (2003) 30 Cal.4th 226, 259, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841, 864 ["As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety."]; *People v. Friend* (2009) 47 Cal.4th 1, 29, quoting *People v. Alfaro* (2007) 41 Cal.4th 1277, 1328 ["[o]nly if an admonition would not have cured the harm is the claim of misconduct preserved for review"].)

Under the circumstances present here, we conclude Sanchez's claim of prosecutorial error is waived on appeal. Although we are mindful of the fact that an admonition may not cure every type of harm caused by prosecutorial misconduct (*People v. Hill* (1998) 17 Cal.4th 800, 820), we see no reason why that would apply here. In our view, any asserted error has been waived. Nevertheless, to the extent it is argued that a requested admonition would not cure alleged harm, we will address the merits of Sanchez's claim.

**D.  Analysis**

Assuming Sanchez's claim of prosecutorial error had been preserved for appeal, the record shows neither error nor prejudice assuming error. The record does not support Sanchez's assertion that the prosecutor stated defense counsel had lied repeatedly. Further, we reject Sanchez's assertion that the prosecutor's statement—"hoping one or two of you …"—is analogous to the prosecutor's statements challenged in *Sanchez*. We address both statements, in turn, below.

### 1.  The Prosecutor Did Not Suggest Defense Counsel Was Dishonest

The record supports the conclusion that the prosecutor's comments referred to the fact that defense counsel was repeating lies told by Sanchez during his testimony. Taken in isolation, the prosecutor's comments may perhaps support the inference that the prosecutor was implying that defense counsel was lying. However, considering the prosecutor's comments in the context of the overall argument, as we must (*People v. Centeno, supra,* 60 Cal.4th at p. 667), the prosecutor was plainly arguing Sanchez was lying, and defense counsel was repeating Sanchez's lies "over, and over, and over."

The common thread woven through the prosecutor's case was that Sanchez was "lying to literally everyone in this case." During argument, the prosecutor stated Sanchez is "an admitted liar. Over, and over, and over, and over again." Point-by-point, she provided specific examples where Sanchez's testimony was contradicted by the testimony of other witnesses, and by his own prior statements. Thus, when the prosecutor stated that defense counsel had "talked for three hours at a very high volume and repeated the same lies *over, and over, and over,*" she was plainly referring to the fact that defense counsel was repeating lies told by Sanchez.

Although Sanchez invites us to conclude the jury drew the most damaging inference possible from the prosecutor's comments, we decline to do so. (*People v. Centeno, supra,* 60 Cal.4th at p. 667 [" 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' "].) The record does not support Sanchez's assertion that the prosecutor had maligned defense counsel.

Even assuming the jury interpreted the prosecutor's comments as an attack on defense counsel's honesty and veracity, Sanchez has not met his burden of establishing prejudice. During the course of the

prosecutor's closing argument, the jury was twice admonished to judge the case solely upon the evidence presented and the law, and not upon any aspersions cast by the attorneys. The trial court's admonition was reinforced when it subsequently instructed the jury that "[n]othing that attorneys say is evidence[,]" including their remarks during opening and closing statements. As nothing upon this record suggests otherwise, we presume the jury followed the trial court's instruction, "and that any error was cured." (See *People v. Dickey* (2005) 35 Cal.4th 884, 914.)

### *2. The Prosecutor Did Not Attempt to Intimidate Holdout Jurors*

Relying upon *People v. Sanchez, supra,* 228 Cal.App.4th at pages 1529 through 1530, Sanchez further contends the prosecutor attempted to intimidate any potential holdout jurors by suggesting they would have to be gullible to believe Sanchez's defense. The prosecutor specifically stated, "You repeat the same lie over, and over, and you hope [¶] … [¶] hope that one or two of you…."

In *Sanchez*, the prosecutor argued the "defendant hopes that 'one of you' will be 'gullible enough,' 'naïve enough,' and 'hoodwinked' by the defense arguments so that he 'can go home and have a good laugh at your expense.' " (*Sanchez*, *supra*, 228 Cal.App.4th at p. 1529.) The appellate court concluded, "The prosecutor's comments fell outside the bounds of the 'wide latitude' given to prosecutors during argument because the comments were designed to offend and intimidate the potential holdout juror who doubted defendant's guilt." (*Id.* at p. 1530.) According to the court, the prosecutor's comments could have a "chilling effect on the jury's deliberative process." (*Id*. at p. 1534.)

We reject Sanchez's assertion that the prosecutor's challenged comments here denigrated any potential holdout jurors. The challenged comments here are not remotely similar to the prosecutor's statements in *Sanchez*. While the prosecutor did imply Sanchez was hoping one or two of the jurors would find his testimony credible, she did not suggest they would be gullible in so doing. We find no error, and for the reasons discussed above, no prejudice assuming error.

(Doc. No. 15-2 at 1240-46 (footnote omitted)).

### 2. Analysis

In raising his claim, Petitioner relies on the same arguments he advanced in his petition for review to the California Supreme Court.  (*See* Doc. No. 1 at 5, 37, 42-50).  However, Petitioner wholly fails to engage with the state appellate court's analysis and rejection of this claim or present any argument as to why the state court's decision was contrary to, or an unreasonable application of, Supreme Court precedent or based on an unreasonable determination of the facts.

15

1    Respondent argues that Petitioner's prosecutorial misconduct claim is procedurally barred

2    because the appellate court found he had waived his claim by failing to request a curative

3    instruction.  (Doc. No. 16 at 22).  Even if not barred, Respondent argues Petitioner's claim fails

4    under AEDPA because the Supreme Court "has never under due-process principles condemned

5    denigrating remarks directed toward opposing counsel or statements suggesting that any potential

6    holdout jurors would have to be gullible to believe the defendant."  (*Id.* at 23).  Respondent next

7    argues the state court reasonably rejected Petitioner's claim and a fair-minded jurist could agree

8    with the conclusion.  (*Id.* at 24-25).  Finally, Respondent argues there is "no reason to believe that

9    but for the prosecutor's comments …, the jury would have reached a different conclusion" such

10   that Petitioner has failed to show prejudice.  (*Id.* at 25).

11   In his traverse, Petitioner simply renews his argument that the prosecutor accused his

12   counsel of lying and "such arguments are misconduct both as personal attacks on defense counsel

13   and as an accusation of deceptiveness."  (Doc. No. 17 at 3).  Petitioner then lists—without

14   discussion or analysis—three, out of circuit appellate decisions and *Beger v. United States*, 295

15   U.S. 78 (1935).  (*Id.*).

16   "To decide if improper comments give rise to a constitutional violation, the relevant

17   question is whether the prosecutors' comments so infected the trial with unfairness as to make the

18   resulting conviction a denial of due process."  *Michaels v. Davis*, 51 F.4th 904, 951 (9th Cir.

19   2022) (quotation marks omitted) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

20   Importantly, an allegedly improper statement must be considered "in the context of the entire

21   trial," including any instructions to the jury and the evidence against the defendant.  *Id.* at 954.

22   To the extent Petitioner relies on *Berger*, that case is consistent with the standard set forth

23   above.  In *Berger*, the prosecutorial misconduct challenged in the federal proceedings included

24   misstating facts in his cross-examination of witnesses; putting words into the mouths of witnesses

25   that they had not said; suggesting by his questions that out of court statements had been made to

26   him personally; pretending to understand that a witness said something which had not been said

27   and cross-examining on that basis; assuming prejudicial facts not in evidence; bullying and

28   arguing with witnesses; and "in general, … conducting himself in a thoroughly indecorous and

16

improper manner." 295 U.S. at 84. While the trial judge "sustained objections to some of the questions, insinuations and misstatements, and instructed the jury to disregard them," the Supreme Court concluded the "situation was one which called for stern rebuke and repressive measures" and it was "impossible to say that the evil influence upon the jury of these acts of misconduct was removed by such mild judicial action as was taken." *Id.* at 85. The Supreme Court further observed that the case against Berger was not strong and may even be classified as weak such that "prejudice to the cause of the accused [was] so highly probable that [the Court was] not justified in assuming its nonexistence." *Id.* at 89. However, even the *Berger* court recognized that it was not a case "where the misconduct of the prosecuting attorney was slight or confined to a single instance" and the result may have been different if the case against Berger were strong or the evidence of his guilt overwhelming. *Id.*

Initially, as noted by Respondent, this claim is arguably procedurally barred because the state court found it waived. Alternatively, even if not procedurally barred, the state court found that the prosecutor's statements did not impugn defense counsel's statements but characterized defendant's statements as lies. Furthermore, even assuming that the prosecutor's statements were improper (not conceded), the state appellate court properly determined that Petitioner was not prejudiced. (Doc. No. 15-2 at 1244-46). The appellate court specifically noted that "the jury was twice admonished to judge the case solely upon the evidence presented and the law, and not upon any aspersions cast by the attorneys" and the trial court reinforced this admonition when it "instructed the jury that '[n]othing that attorneys say is evidence[.]'" (*Id.* at 1245-46). In fact, the trial court admonished the jury before closing arguments started and after every defense objection to the prosecution's closing arguments. *See* Doc. No. 15-1 at 1986 (advising the jury "[t]he summations are not -- and counsels' remarks … are not evidence"); *id.* at 2043 (instructing the jury that they would be instructed on the law and were "to follow our instructions in that regard"); *id.* at 2127 (instructing the jury "to decide the case solely and only on the evidence and the law"); *id.* at 2131 ("Ladies and gentlemen, you're to judge the case solely on the evidence and the law, and any dispersions that counsel may cast towards either side, disregard that. What the attorneys say is not evidence. You are the sole judges of the evidence and the law."); *id.* at 2133

1  (instructing to "judge the case solely on the evidence and the law").  Thus, the appellate court

2  concluded the trial court addressed any error by properly instructing the jury such that Petitioner

3  was not prejudiced.  This conclusion is consistent with Supreme Court precedent.  *See Darden*,

4  477 U.S. at 180-82 (concluding that although prosecution's statements in closing argument

5  "undoubtedly were improper," petitioner was not entitled to federal habeas relief, in part because

6  "[t]he trial court instructed the jurors several times that their decision was to be made on the basis

7  of the evidence alone, and that the arguments of counsel were not evidence").

8        Because the prosecution's conduct, even if improper, did not arise to a constitutional

9  violation, Petitioner cannot show that the state court's rejection of his prosecutorial misconduct

10  claim was contrary to, or an unreasonable application of, clearly established federal law, or based

11  upon an unreasonable determination of the facts.  Thus, the undersigned recommends that ground

12  one be denied.

13       **B.**     **Ground Two-Judicial Notice**

14        In his second ground, Petitioner challenges the trial court's decision to take judicial notice

15  of times in a CJIS report.  (Doc. No. 4 at 7, 38).

16         **1.  State Court Decision**

17        The state appellate court rejected Petitioner's judicial notice claim, explaining:

18
19      Sanchez contends the trial court erred by taking judicial notice of
20  the date and time of his arrest and booking noted on a certified
21  California Justice Information Services (CJIS) printout. According
    to Sanchez, the trial court's error was prejudicial under any
    standard as the admission of this evidence undermined his
    credibility, which was pivotal to his claim of self-defense. We find
    his assertions unpersuasive.

22      **A.  Background**

23      At trial, Sanchez claimed that he fired every shot in self-defense.
24  Following his arrest, he was interrogated twice. The first
    interrogation occurred in Arizona after he was extradited to the
    United States, and the second occurred in Bakersfield. Sanchez
25  testified he was interrogated a third time, and during this
    interrogation, he told detectives he had acted in fear for his life.
26  According to Sanchez, the third interrogation occurred at the
    Bakersfield Police Department before he was transported to the
27  county jail, and the interrogation lasted 30 minutes to one hour.

28      In rebuttal, the prosecutor called Detective Littlefield and Detective

Davis, who both testified that a third interrogation had never occurred. The prosecutor asked Detective Littlefield what time he completed Sanchez's arrest card. Detective Littlefield replied, "It was shortly after 10:00 p.m. I don't remember the exact time offhand." The prosecutor asked if the arrest card was submitted at 10:28 p.m., to which Detective Littlefield replied, "[s]ounds correct." Detective Littlefield further explained that the sheriff's department's booking system attaches an electronic signature, date, and timestamp when an officer submits an electronic arrest card, which is maintained in an automated system called "the Arietis System."

The prosecutor asked Detective Littlefield whether he knew the exact time that he submitted Sanchez's arrest card. Detective Littlefield replied, "No, not offhand. It was before 10:30 p.m." The prosecutor asked whether it would refresh Detective Littlefield's memory to look at the arrest card. Defense counsel objected pursuant to *Melendez-Diaz [v. Massachusetts*, 557 U.S. 305 (2009)].

The trial court addressed defense counsel's objection outside of the presence of the jury. During the hearing, the prosecutor marked Court's Exhibits Nos. 16 and 17. Court Exhibit No. 16 was a document from the Kern County Arietis system that showed Sanchez's arrest card was entered into the Arietis system at 10:28 p.m. Court Exhibit No. 17 is a printout from CJIS titled, "Display Booking Detail," that shows Sanchez was booked into the county jail on June 29, 2018, at 11:07 p.m.

The prosecutor asked the trial court to take judicial notice of the date and time Sanchez was arrested and booked. The trial court took the matter under consideration. In the interim, the trial court ruled the documents could be used to refresh Detective Littlefield's recollection.

Detective Littlefield testified that after reviewing Court's Exhibit Nos. 16 and 17, he recalled submitting Sanchez's arrest card at 10:28 p.m., and that he and Detective Davis had transported Sanchez to the county jail around 11:00 p.m. Detective Littlefield added, "and it's annotated [Sanchez] was booked at 11:07 [p.m.]"

Detective Littlefield explained that prior to transporting Sanchez to the county jail for booking, he had to call ahead to notify the jail of Sanchez's status as a peace officer. Between the time of his arrest and the time of booking, Sanchez was being transported from the police department to the county jail. Detective Littlefield estimated the subsequent booking process took approximately 15 minutes.

The prosecutor asked the trial court to mark and admit a certified printout of Court's Exhibit No. 17. The CJIS printout was marked People's Exhibit No. 124 for identification purposes. Defense counsel renewed his *Melendez-Diaz* objection.

Outside of the presence of the jury, the trial court addressed the prosecutor's request for judicial notice. People's Exhibit No. 124

stated Sanchez's bail was set in the amount of $7 million, in addition to information about what time Sanchez's arrest card was submitted and what time he was booked into the jail. Defense counsel stated that if his *Melendez-Diaz* objection were overruled, he would prefer "the Court to just take judicial notice of the CJIS [printout] and not have that document admitted because that could cause wild speculation," even if the bail amount were redacted with a sharpie.

The trial court ruled that People's Exhibit No. 124 was admissible as an official record (Evid. Code, § 1280), without requiring a witness to testify as to the document's identity and method of preparation provided the court took judicial notice of the trustworthiness of the document, or "sufficient independent evidence shows that the record or report was prepared in a trustworthy manner." The trial court added that pursuant to Evidence Code section 664, the statutory presumption that a public official has performed his or her duty may also be used to lay a foundation for an official record.

The trial court granted the People's request to take judicial notice of the time and date of Sanchez's arrest and booking as noted on the certified CJIS printout. The trial court overruled defense counsel's *Melendez-Diaz* objection.

People's Exhibit No. 124 was not moved into evidence. When proceedings resumed before the jury, the jury was not informed that the trial court had taken judicial notice of any facts.

During her closing argument, the prosecutor argued that a third interrogation could not have occurred within the 39-minute timeframe between Sanchez's arrest and when he was booked into county jail. The prosecutor explained the interrogation would have had to have occurred all while Sanchez's arrest information was being entered into the computer, he was being prepared for transport, the transportation itself, and then the booking procedures, which normally take between 15 to 20 minutes.

**B. Legal Principles**

Pursuant to Evidence Code section 452, subdivision (h), judicial notice may be taken of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." The trial court is required to take judicial notice of any matter specified in Evidence Code section 452 if requested to do so by a party, if that party "(a) Gives each adverse party sufficient notice of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; and [¶] (b) Furnishes the court with sufficient information to enable it to take judicial notice of the matter." (Evid. Code, § 453.)

We review the trial court's ruling on a request for judicial notice for an abuse of discretion. (*Physicians Committee for Responsible*

20

*Medicine v. Los Angeles Unified School Dist.* (2019) 43 Cal.App.5th 175, 182.) " 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)

**C. Analysis**

Sanchez has failed to demonstrate that the trial court abused its discretion in granting judicial notice of the date and time of his arrest and booking. Although defense counsel objected to the prosecutor's request to take judicial notice of these facts, defense counsel did not assert the date and time Sanchez was arrested and booked were inaccurately stated on the CJIS printout, nor did he argue this information was reasonably subject to dispute. Additionally, assuming these facts constitute hearsay, he does not address the trial court's ruling finding them admissible under the official records exception. (Evid. Code, § 1280.)

Sanchez contends that while the trial court is permitted to take judicial notice of the existence of documents, it is not permitted to take judicial notice of the truth of matters stated therein. For example, "[w]hile a court may take judicial notice of the existence of documents in a court file, it "cannot take judicial notice of the truth of hearsay statements simply because the statements are part of a court record." (*Magnolia Square Homeowners Assn v. Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049, 1056.)

Here, the trial court specifically took judicial notice of facts stated within the CJIS printout, and not simply the existence of the printout itself. Assuming these undisputed facts constitute hearsay statements, the trial court held this information and the CJIS printout were admissible pursuant Evidence Code section 1280. The trial court's ruling necessarily implies that the foundational elements for the admissibility of the CJIS printout had been met. (Evid. Code, § 402, subd. (c); *People v. Williams* (1997) 16 Cal.4th 153, 196.)

Sanchez never challenged the trial court's ruling finding the date and time of his arrest and booking admissible under Evidence Code section 1280, nor does he explicitly do so on appeal. " 'The proponent of hearsay has to alert the court to the exception relied upon and has the burden of laying the proper foundation.' " (*People v. Turner* (2020) 10 Cal.5th 786, 822.) However, "it is the appellant's burden to affirmatively demonstrate error [on appeal]." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As the date and time of Sanchez's arrest and booking were not reasonably subject to dispute, and Sanchez has not shown these facts were hearsay not within an exception, judicial notice of these facts was not an abuse of the trial court's discretion.

21

Sanchez further contends the date and time of his arrest and booking are "testimonial," and therefore, judicial notice of these facts violated his right to confrontation under the Sixth Amendment. His argument is minimally developed and is not supported by the legal authority he relies upon.

"Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*People v. Sanchez* (2016) 63 Cal.4th 665, 689.) Sanchez does not explain how the date and time that he was arrested and booked into county jail were primarily memorialized for "the purpose of establishing or proving some fact at trial" rather than "having been created for the administration of [the] entity's affairs." (*Melendez-Diaz, supra,* 557 U.S. at p. 324.) In any event, we find his implied assertion unpersuasive as Detective Littlefield's testimony shows these are objective facts which are routinely recorded when a subject is arrested and booked into county jail. (Compare *United States v. Williams* (8th Cir. 2013) 720 F.3d 674, 698-699 [fingerprint cards created as part of a routine booking procedure are nontestimonial]; with *People v. Sanchez*, *supra*, 63 Cal.4th at pp. 696-697 [sworn notices, which memorialized incriminating statements for future criminal prosecutions, are testimonial].)

The fact that this information became relevant at trial does not change the characterization of these facts and the primary purpose for which they were initially recorded. As our Supreme Court has explained in the context of business records, "[s]ome notations in business records may ultimately prove relevant at a trial. But their mere relevance does not make them testimonial. Any number of nontestimonial statements, made in a variety of contexts, may ultimately become relevant in a case. Indeed, were a statement irrelevant it would be inadmissible regardless of any Sixth Amendment bar." (*People v. Lopez* (2012) 55 Cal.4th 569, 589.)

The error here, if any, by the trial court in granting the prosecutor's request for judicial notice is of a state law statutory dimension. Applying this standard, we conclude Sanchez has failed to demonstrate a "reasonable probab[ility]" that the result of the trial would have been different but for any presumed error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The hearing pertaining to the prosecutor's request for judicial notice occurred outside of the presence of the jury. As a result, the jury never knew that the trial court had taken judicial notice of the date and time of Sanchez's arrest and booking. And, even if the jury was aware of the trial court's ruling, the jury was never instructed to accept as true any facts judicially noticed by the trial court (see Evid. Code, § 457). Upon this record, there is no evidence Sanchez was prejudiced by the trial court's ruling granting the prosecutor's request for judicial notice.

Sanchez observes that Detective Littlefield inadvertently read the time of Sanchez's booking aloud from the court's exhibit while the

1    prosecutor was attempting to refresh his recollection. During his
     testimony, Detective Littlefield stated "[w]e arrived at the jail
2    around 11:00 p.m., and *it's annotated* [Sanchez] was booked at
     11:07 [p.m.]" Thus, according to Sanchez, the contents of the CJIS
3    printout were improperly related to the jury. This issue is distinct
     from the question of whether judicial notice of facts by the trial
4    court was proper.

5    A writing being used to refresh a witness's recollection" 'should
     not be read aloud before the jury.' " (*People v. Vasquez* (2017) 14
6    Cal.App.5th 1019, 1041.) We agree that Detective Littlefield should
     not have noted what was annotated on the court's exhibit, but we
7    reject Sanchez's assertion that prejudice resulted from his fleeting
     comment. Further, contrary to Sanchez's assertion, the record does
8    not support the conclusion that the trial court was attempting to
     mitigate any prejudice from this error by subsequently granting the
9    prosecutor's request for judicial notice.

10   We further observe Detective Littlefield testified that based upon
     his recollection, he, Detective Davis, and Sanchez had arrived at the
11   county jail at 11:00 p.m. His testimony, which was clearly proper,
     narrowed the 39-minute window even further for the third
12   interrogation to have occurred. Consequently, no prejudice resulted
     from Detective Littlefield's brief statement concerning what was
13   annotated on the court's exhibit.

14   (Doc. No. 15-2 at 1247-54 (footnotes omitted)).

15          **2.    Analysis**

16          In advancing the "judicial notice issue," Petitioner once again relies on his arguments

17   submitted to the state supreme court in his petition for review.  (*See* Doc. No. 4 at 7, 38, 51-59).

18   Petitioner takes the position that because the CJIS records "were testimonial under *Williams [v.*

19   *Illinois*, 567 U.S. 50 (2012)] and *Sanchez*," "[i]t was error under the Confrontation Clause and the

20   Hearsay Rule to have taken judicial notice of them."  (Doc. No. 4 at 58).  Respondent argues

21   Petitioner's claim is not cognizable because it raises a state law issue and, to the extent he alleges

22   a violation of the Confrontation Clause, his claim fails because he "failed to show that the date

23   and time he was arrested and booked into county jail were primarily memorialized for 'the

24   purpose of establishing or proving some fact at trial' rather than 'having been created for the

25   administration of [the] entity's affairs,'" such that they were not testimonial.  (Doc. No. 16 at 30-

26   32).  Further, Respondent argues Petitioner was not prejudiced because the jury was not aware

27   that the court took judicial notice of the arrest and booking times.  (*Id.* at 33).

28          Generally, federal habeas relief is not warranted based only on alleged errors in state law,

                                                    23

1    including errors in interpreting and applying the state evidentiary rules.  *Estelle v. McGuire*, 502

2    U.S. 62, 67-68, 72 (1991); *see Walden v. Shinn*, 990 F.3d 1183, 1205 (9th Cir. 2021) ("we cannot

3    grant federal habeas relief founded on an alleged non-constitutional state evidentiary error").

4    However, when "evidence is introduced that is so unduly prejudicial that it renders the trial

5    fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a

6    mechanism for relief."  *Andrew v. White*, 145 S.Ct. 75, 75 (2025) (quoting *Payne v. Tennessee*,

7    501 U.S. 808, 825 (1991)).  To obtain relief on an evidentiary ruling, the petitioner must show

8    that the error was of a constitutional dimension and that it was not harmless.  *Brecht v.*

9    *Abrahamson*, 507 U.S. 619 (1993).  This requires the error to have had "'a substantial and

10    injurious effect' on the verdict."  *Id.* at 623.

11        The Sixth Amendment grants a criminal defendant the right "to be confronted with the

12    witnesses against him."  U.S. Const. amend. VI.  "A witness's testimony against a defendant is

13    thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant

14    had a prior opportunity for cross-examination."  *Melendez-Diaz*, 557 U.S. at 309 (citing *Crawford*

15    *v. Washington*, 541 U.S. 36, 54 (2004)).  The Confrontation Clause applies to "testimonial

16    statements," including "statements that were made under circumstances which would lead an

17    objective witness reasonably to believe that the statement would be available for use at a later

18    trial."  *Id.*  "Violation of the Confrontation Clause, however, is subject to harmless-error

19    analysis."  *Woods v. Sinclair*, 764 F.3d 1109, 1126 (9th Cir. 2014) (citing *Delaware v. Van*

20    *Arsdall*, 475 U.S. 673, 684 (1986)).  Thus, Petitioner must still show that the violation had a

21    substantial and injurious effect on the verdict as required under *Brecht.  See Gann v. Diaz*, 802 F.

22    App'x 283, 284 (9th Cir. 2020) (applying *Brecht* standard to find any confrontation error

23    harmless).

24        Here, the state appellate court reasonably concluded that the date and time in the CJIS

25    report were not testimonial because "Detective Littlefield's testimony shows these are objective

26    facts which are routinely recorded when a subject is arrested and booked into county jail" rather

27    than being recorded for the purpose of a future prosecution.  (Doc. No. 15-2 at 1252).  While

28    Petitioner relies on *Melendez-Diaz* to support that the report violated his confrontation rights,

24

1    *Melendez-Diaz* is easily distinguishable.  In *Melendez-Diaz*, the United States Supreme Court

2    concluded that certificates of analysis reporting that the substance found on a criminal defendant

3    was cocaine admitted at trial were essentially affidavits completed for the purpose of the

4    litigation, rendering them testimonial statements that violated the defendant's confrontation rights

5    absent the proper showing of unavailability and a prior chance to cross-examine the authors.  *Id.*

6    at 310-11.  Unlike *Melendez-Diaz*, the "statements" challenged here are simply the date and time

7    of Petitioner's booking.  There is nothing to support that the date and time were recorded for later

8    use at trial rather than in the ordinary course of business in booking an arrested individual.  Thus,

9    the state appellate court's conclusion that the statements were not testimonial is not contrary to

10   *Melendez-Diaz*.

11          Further, even if the statements were testimonial and amounted to a constitutional

12   violation, Petitioner is not entitled to federal habeas relief because he cannot show that he was

13   prejudiced by their admission.  Critically, the prosecution requested that the trial court take

14   judicial notice of the statements, and the trial court granted the request outside the presence of the

15   jury.  (*See* Doc. No. 15-1 at 1621, 1662).  At no point did the trial court inform the jury that it had

16   taken judicial notice of the statements in the CJIS report, nor did the prosecutor refer to the

17   statements in closing arguments.  The CJIS report was marked for identification but was never

18   admitted into evidence.  (*See* Doc. No. 15-1 at 618-19, 645).  Thus, as the state appellate court

19   concluded, there is no evidence Sanchez was prejudiced because "the jury never knew that the

20   trial court had taken judicial notice of the date and time of [his] arrest and booking."  (Doc. No.

21   15-2 at 1253).

22          Petitioner cannot show that the state court's rejection of his judicial notice claim was

23   contrary to, or an unreasonable application of, clearly established Supreme Court precedent,

24   nor that it was based on an unreasonable determination of the facts.  Thus, the undersigned

25   recommends that ground two be denied.

26        **C.    Ground Three-Presence at Readback**

27          In ground three, Petitioner argues he was denied his right to be present at trial when he

28   was not permitted to be present for a readback of his testimony during the jury's deliberations.

25

(Doc. No. 4 at 7).

## 1. State Court Decision

The appellate court rejected Petitioner's readback claim on direct review, reasoning:

> Sanchez asserts the trial court violated his right to due process under the Fourteenth Amendment by allowing testimony to be read back to the jury in his absence. We disagree.

> **A. Background**

> Shortly after the jury retired to begin deliberations, the foreperson requested a readback of portions of Sanchez's testimony. The following day, defense counsel filed a motion objecting to any readback of testimony occurring in Sanchez's absence.

> Outside of the presence of the jury, the parties discussed whether the readback must occur in open court, or whether it may occur in the deliberation room, without the parties present. Defense counsel asserted that the Ninth Circuit held that a readback of testimony in the defendant's absence violates the defendant's right to due process. Defense counsel directed the trial court to several cases, including, *Fisher v. Roe* (9th Cir. 2001) 263 F.3d 906, *Walters v. Maass* (9th Cir. 1995) 45 F.3d 1355, 1358, and *Jammal v. Van de Kamp* (9th Cir. 1991) 926 F.2d 918.

> Relying upon *People v. McCoy* (2005) 133 Cal.App.4th 974 at page 981 (*McCoy*), the trial court overruled defense counsel's objection and denied his request for Sanchez to be present during the readback of testimony. The court reporter read the testimony requested to the jury in the deliberation room.

> **B. Analysis**

> " 'A criminal defendant's right to be personally present at trial is guaranteed under the federal Constitution by the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. It is also required by section 15 of article I of the California Constitution and by [Penal Code] sections 977 and 1043.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 798-799.) A criminal defendant's federal constitutional right to be personally present at trial encompasses "all critical stages of the criminal prosecution, i.e., 'all stages of the trial where his absence might frustrate the fairness of the proceedings' [citation], or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' " (*People v. Rodriguez* (1998) 17 Cal.4th 253, 260.)

> In *McCoy*, this court observed that the United States Supreme Court "has never held that a readback is a critical stage of trial." (*McCoy, supra*, 133 Cal.App.4th at p. 982.) The California Supreme Court has also repeatedly rejected the argument that a readback of testimony occurring outside the presence of a defendant or counsel constitutes a federal or state constitutional violation. (See, e.g.,

*People v. Lucas* (2014) 60 Cal.4th 153, 300 ["a readback proceeding is not a critical stage of trial"], disapproved in part by *People v. Romero and Self* (2015) 62 Cal.4th 1, 53-54, fn. 19; *People v. Butler* (2009) 46 Cal.4th 847, 865 [" '[w]e have repeatedly stated that the rereading of testimony is not a critical stage of the proceedings' "]; *People v. Cox* (2003) 30 Cal.4th 916, 963 [same], disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Ayala* (2000) 23 Cal.4th 225, 288 [same]; *People v. Horton* (1995) 11 Cal.4th 1068, 1120-1121 ["a 'defendant is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his or her opportunity to defend the charges against him, and the burden is on defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial' "].)

Sanchez urges this court to follow the Ninth Circuit's decision in *Fisher v. Roe, supra*, 263 F.3d 906. "Even on federal questions, however, Ninth Circuit cases do not bind the state courts." (*McCoy, supra,* 133 Cal.App.4th at p. 982.) In any event, we are bound to follow decisions by the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

We further observe that Sanchez does not explain how he was prejudiced by the readback of testimony in his absence. Rather, he suggests the People cannot surmount the presumption that any error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18, because the record does not reveal what, if anything, occurred during the readback in the deliberation room. "Prejudice cannot be presumed on a silent record." (*People v. Medina* (1990) 51 Cal.3d 870, 904.) As the instant case presents no exception to this well-established rule, we find no prejudice assuming error.

(Doc. No. 15-2 at 1254-56).

### 2. Federal Habeas Analysis

Once again relying on his brief submitted to the state supreme court, Petitioner argues that *Fisher v. Roe*, 263 F.3d 906 (9th Cir. 2001) supports that the denial of his presence at the readback amounts to a Fourteenth Amendment due process violation. (Doc. No. 4 at 8, 37, 60-66). Respondent argues Petitioner's claim fails because "the Supreme Court has never held that readback of testimony to a jury is a critical stage of the trial such that the right to be present attaches particularly where, as here, defense counsel was advised prior to the readback." (Doc. No. 16 at 35 (citing *LaCrosse v. Kernan*, 244 F.3d 702, 707-08 (9th Cir. 2001)).

"[T]he right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant." *Rushen v. Spain*, 464 U.S. 114, 117 (1983). However, as Respondent argues, the Supreme Court "has never addressed whether readback of

1    testimony to a jury is a critical stage of the trial triggering a criminal defendant's fundamental

2    right to be present." *Oubichon v. Cate*, 443 F. App'x 235, 237-38 (9th Cir. 2011) (quoting

3    *LaCrosse*, 244 F.3d at 708).  Petitioner's reliance on the Ninth Circuit's *Fisher* does not show

4    that the state appellate court's rejection of his claim was contrary to clearly established federal

5    law because such is established by decisions of the Supreme Court, rather than individual circuits.

6    *See* 28 U.S.C. § 2254(d)(1).

7        Further, even if *Fisher* controlled, it is easily distinguishable.  In *Fisher*, the petitioner

8    established that not only were neither he nor his counsel present for the readback, but they were

9    also not informed that the readback was even occurring.  263 F.3d at 911.  Additionally, the

10   "court reporter decided when to stop reading testimony based on the reaction of the jurors" and

11   the trial court "failed to control the readback."  *Id.*  The Ninth Circuit observed that Fisher and his

12   codefendant "had a right to be involved in and present at the readback if their absence could have

13   undermined the fairness of the proceedings."  *Id.* at 915.  The Ninth Circuit concluded that the

14   absence of the defendants, "and that of their attorneys, greatly increased the risk of prejudice"

15   because, had they been present, they would have been able to ensure that testimony of both state

16   and defense witnesses was read, as well as ensured that cross-examination and direct testimony

17   were read, and that the readback was accurate and fair.  *Id.* In reaching its decision, the Ninth

18   Circuit distinguished *LaCrosse* because "LaCrosse's attorney not only was aware of the readback

19   procedure proposed by the judge, but the attorney was consulted by the court and agreed to the

20   proposed procedure and stipulated that his client need not be present."  *Id.* at 916.

21       Here, Petitioner's attorney was consulted regarding the readback and worked with the

22   prosecutor to agree on the portions of the testimony that would be included in the readback.

23   (Doc. No. 15-1 at 2249-59).  Defense counsel indicated he was "satisfied" with the portions of the

24   record that would be read.  (*Id.* at 2253).  While unlike in *LaCrosse*, Petitioner's counsel

25   continued to object to Petitioner not being allowed to be present, the situation here was not as

26   egregious as in *Fisher* where counsel did not have a chance to be involved in determining what

27   would be included in the readback.

28       Petitioner cannot show that the state court's rejection of his readback claim was contrary

1    to, or an unreasonable application of, clearly established Supreme Court precedent, nor that it was

2    based on an unreasonable determination of the facts.  The undersigned recommends that ground

3    three be denied.

4         **A.      Ground Four-Cumulative Error**

5         In his final ground, Petitioner argues the combined errors in the proceedings deprived him

6    of his right to a fair trial.  (Doc. No. 4 at 10, 37, 67-68).

7         "Cumulative error applies where, although no single trial error examined in isolation is

8    sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still

9    prejudice[d] a defendant." *Cook v. Kernan*, 801 F. App'x 474, 477 (9th Cir. 2020) (internal

10   quotations and citations omitted).  The cumulative error, however, "must render the trial and

11   sentencing fundamentally unfair." *Id.* (citations omitted).  Absent a finding of any error on any of

12   the proceeding grounds, the Court cannot find cumulative error. *Williams v. Filson*, 908 F.3d

13   546, 570 (9th Cir. 2018) (a court "cannot consider the cumulative effect of *non*-errors"); *see also*

14   *McGill v. Shinn*, 16 F.4th 666, 684 (9th Cir. 2021).

15        Because the undersigned finds none of Petitioner's preceding claims have merit, the

16   undersigned concludes Petitioner cannot show his conviction was fundamentally unfair nor a

17   "unique symmetry" of harmless errors that "amplify each other in relation to a key contested issue

18   in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).  Thus, ground four is

19   without merit and should be denied.

20        **V.  CERTIFICATE OF APPEALABILITY**

21        A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

22   court's denial of a petition; he may appeal only in limited circumstances. *See* 28 U.S.C. § 2253;

23   *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

24   district court to issue or deny a certificate of appealability when entering a final order adverse to a

25   petitioner. *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

26   Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

27   showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

28   the petitioner to show that "jurists of reason could disagree with the district court's resolution of

1  his constitutional claims or that jurists could conclude the issues presented are adequate to

2  deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v.*

3  *McDaniel*, 529 U.S. 473, 484 (2000).  Because Petitioner has not made a substantial showing of

4  the denial of a constitutional right, the undersigned recommends that the court decline to issue a

5  certificate of appealability.

6       Accordingly, it is **RECOMMENDED**:

7      1.  Petitioner be DENIED all relief on his Amended Petition for Writ of Habeas Corpus

8         (Doc. No. 4); and

9      2.  Petitioner be denied a certificate of appealability.

10                      **NOTICE TO PARTIES**

11       These Findings and Recommendations will be submitted to the United States District

12  Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

13  after being served with a copy of these Findings and Recommendations, a party may file written

14  objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

15  "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

16  **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

17  wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

18  CM/ECF document and page number, when possible, or otherwise reference the exhibit with

19  specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

20  the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

21  636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

22  waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

23  Dated:    October 24, 2025

24                                   HELENA M. BARCH-KUCHTA

25                                   UNITED STATES MAGISTRATE JUDGE

26

27

28